James R. Wheaton (CA Bar 115230)
Lynne R. Saxton (CA Bar 226210)
Environmental Law Foundation
1736 Franklin Street, 9th Floor, Oakland, CA 94612
(510) 208-4555, Fax: (510) 208-4562
wheaton@envirolaw.org
lsaxton@envirolaw.org

Albert Ettinger (IL Bar 3125045) *Pro Hac Vice* Application Pending
Environmental Law and Policy Center
35 E.Wacker, Suite 1300, Chicago, Illinois 60601
(312) 795-3707,
AEttinger@ELPC.org

Tom Neltner (IN 19246-49) *Pro Hac Vice* Application Pending
1701 Tilton Dr., Silver Spring, MD  20902
(317) 442-3973, Fax: (866) 234-8505
neltner@ikecoalition.org

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA CLUB, a non-profit organization, ENVIRONMENTAL LAW AND POLICY CENTER, a non-profit organization PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, a non-profit organization, PHYSICIANS FOR SOCIAL RESPONSIBILITY, a non-profit organization, and UNITE HERE<br>    Plaintiffs,<br><br>    vs.<br><br>STEPHEN L. JOHNSON, in his official Capacity as Administrator of the United States Environmental Protection Agency<br>    Defendant. | Case. No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT DECLARATORY AND INJUNCTIVE RELIEF                                                    Page 1

# INTRODUCTION

1. Plaintiffs SIERRA CLUB, ENVIRONMENTAL LAW AND POLCIY CENTER, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, PHYSICIANS FOR SOCIAL RESPONSIBILITY, and UNITE HERE bring this civil action to compel Defendant STEPHEN L. JOHNSON, in his official capacity as Administrator of the UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ("EPA"), to initiate rulemaking pursuant to the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601-2629, regarding nonylphenol ("NP") and nonylphenol ethoxylates ("NPEs"). Plaintiffs seek to protect the interests of their members who may suffer adverse health effects from exposure to NP and NPEs and whose livelihood, wellbeing and recreational activities may be impacted by NP and NPEs.

# JURISDICTION AND VENUE

2. Sierra Club, the Environmental Law and Policy Center of the Midwest, Pacific Coast Federation Of Fishermen's Associations, Physicians for Social Responsibility, and UNITE HERE file this civil action seeking to compel the Defendant, hereinafter referred to as EPA, to initiate a rulemaking proceeding as requested in the petition filed by Plaintiffs on June 5, 2007 pursuant to Section 21 of the Toxic Substances Control Act, 15 U.S.C. § 2620 (the "Petition"). On August 29, 2007, EPA responded to the Petition by granting the petition in part and denying it in part.

3. Plaintiffs have a right to bring this action pursuant to TSCA, 15 U.S.C. § 2620(b)(4)(A), which authorizes persons that have filed a petition under Section 21 to commence a civil action in a district court of the United States to compel the Administrator to initiate a rulemaking proceeding as requested in the petition.

4. By filing this civil action on or before October 29, 2007, Plaintiffs are filing this case in a timely manner within 60 days of the Administrator's answer. 15 U.S.C. § 2620(b)(4)(A).

5. The Court has jurisdiction pursuant to 15 U.S.C. § 2620(a)(4)(A) and 28 U.S.C. §§ 1331. Plaintiffs are entitled to "an opportunity to have [their] petition considered by the court in a de novo proceeding." 15 U.S.C. § 2620(b)(4)(A).

6. The Court has authority to award the relief sought pursuant to 15 U.S.C. § 2620(b)(4). For the reasons detailed below, the denial of Plaintiffs' petition challenged in this case has caused, is causing and, unless the Court grants the requested relief, will continue to cause injuries to Plaintiffs for which there is no adequate remedy at law.

7. Plaintiffs Sierra Club and Pacific Fishermen reside in the Northern District of California. Since no real property is involved in the action, venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(3).

COMPLAINT DECLARATORY AND INJUNCTIVE RELIEF                                                Page 3

# PARTIES

8. Plaintiff Sierra Club is one of the nation's oldest and largest environmental organizations. It is a nonprofit corporation organized and existing under the laws of California. For over 113 years, the Sierra Club has been dedicated to protecting our nation's natural resources and public health. Sierra Club, on behalf of its members, works to protect and enhance the health of the environment throughout the country. The Sierra Club has over 1.3 million members living throughout the United States.

9. Environmental Law and Policy Center of the Midwest ("ELPC") is a non-profit, §501(c)(3) organization incorporated in Illinois. ELPC's mission is to work to achieve cleaner energy resources and implement sustainable energy strategies, promote innovative and efficient transportation and land use approaches and to develop sound environmental management practices that conserve natural resources and improve the quality of life in our communities. ELPC members live, work and recreate throughout the Midwest.

10. Plaintiff UNITE (formerly Union of Needletrades, Industrial and Textile Employees) and HERE (Hotel Employees and Restaurant Employees International Union) merged on July 8, 2004 forming UNITE HERE. The union represents more than 450,000 active members and more than 400,000 retirees through North America. UNITE HERE has many members that work directly or indirectly with NP and/or NPEs and whose health may be affected adversely by inadequate study of the effect of theses chemicals and by the unnecessary use of them.

11. Plaintiff Pacific Coast Federation of Fishermen's Associations is a non-profit trade organization that services over 25 member fishermen's associations along the Pacific Coast in matters relating to aid and protection of the fishing industry. It is incorporated under the laws of California and headquartered in San Francisco.

12. Physicians for Social Responsibility works to protect human life from the gravest threats to health and survival. It is a non-profit 501(c)(3) corporation incorporated under the laws of Washington, DC and is headquartered in there.

13. Plaintiffs and/or their members commercially fish, drink water, work with, and recreationally fish, canoe, engage in nature study and otherwise use waters that are affected by NP and NPE or that may be so affected. Accordingly, Plaintiffs are adversely affected by the inadequate study of the effects of NP and NPEs alleged below. They are also adversely affected by the known impacts on the environment caused by the manufacture and use of NP an NPE and by the dangerous and unnecessary use of NP and NPE.

14. The EPA is an agency of the United States.

15. Defendant STEPHEN L. JOHNSON is the Administrator of the EPA and, in that role, is charged by Congress with the duty to respond to petitions submitted pursuant to Section 21 of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2620, and adopt regulations pursuant to Section 6 of TSCA, 15 U.S.C. § 2605, and Section 8 of TSCA, 15 U.S.C. § 2607. Defendant JOHNSON is named solely in his official capacity.

# FACTS

## NONYLPHENOL AND NONYLPHENOL ETHOXYLATES

16. Nonylphenol ethoxylates are non-ionic surfactants used in cleaning products. Nonylphenol is used as an intermediate to produce nonylphenol ethoxylates. NP and NPE are produced in quantities of more than 200 million pounds per year each. *Id.*

17. Because of their concern about environmental consequences, two leading producers of cleaning products, Procter & Gamble and Unilever, do not use NP and NPEs in their products. A leading retailer, Wal-Mart, has made NPEs one of its top-priority chemicals of concern and has asked its suppliers to eliminate these chemicals from their products.

18. Researchers at EPA's sister agency, the U.S. Centers for Disease Control and Prevention (CDC) found that one form of NP was detected in the urine of 51% of 394 adults. The adults were from a diverse adult U.S. population. The CDC researchers reported 99% confidence that the 51% of adults with measurable levels was within 6.5 percentage points of the true proportion of the population. Calafat, A, et al, "Urinary Concentrations of Bisphenol A and 4-Nonylphenol in a Human Reference Population". April 2005, *Environ Health Perspect*, 113(4): 391-395 ("CDC Study").

19. Plaintiffs submitted a petition to EPA on June 5, 2007 (the "Petition", Exhibit A) regarding NP and NPE. Plaintiffs asked that EPA, pursuant to Section 4 of TSCA 15 U.S.C. § 2603, undertake rulemaking to consider the need for various studies to determine the

environmental and health effects of NP and NPE. Further, Plaintiffs in the Petition asked that EPA undertake rulemaking under Section 6 of TSCA, 15 U.S.C. § 2605, to determine the need for labeling requirements and certain restrictions on use of NP and NPE. EPA responded to the Petition on August 27, 2007, with its "TSCA Section 21 Petition on Nonylphenol and Nonylphenol Ethoxylates: Response to Citizens Petition," Federal Register, Vol. 72, No 171, p.50954, September 5, 2007. ("EPA Response", Exhibit B).

20. The Petition summarized the results of research regarding NP and NPEs including studies showing *inter alia* :

   a. That, as recognized by the EPA document establishing water quality criteria for NP, NP is highly toxic even considered in isolation form the other NPE breakdown products with which it is found in the environment.

   b. The toxicity of NP and NPEs is additive and, thus, the effect of NP must be considered with the effect of the NPEs with which it is generally found. NP and NPEs have effects on aquatic life in addition to direct toxicity because that are endocrine disrupting chemicals with estrogenic properties that have been shown to have severe effects on the reproductive systems of trout, salmon, amphibians, oysters and other aquatic life.

   c. That human placenta may be affected by NP or NPEs, which may cause early termination of pregnancy or fetal growth defects.

COMPLAINT DECLARATORY AND INJUNCTIVE RELIEF                                              Page 7

**COUNT I - SECTION 4 TESTING**

21.     Plaintiffs reallege paragraphs 1-20 above.

22.     Section 1(b) of TSCA states that it is the policy of the United States that "adequate data should be developed with respect to the effect of chemical substances and mixtures on health and the environment and that the development of such data should be the responsibility of those who manufacture and those who process such chemical substances and mixtures." 15 U.S.C. §2601(b).

23.     The Petition requests that EPA institute rulemaking under Section 4 of TSCA, 15 U.S.C. § 2603 to consider requiring manufacturers and processors of NP and NPE to conduct a number of studies including testing:

    a.     (Request #1) to ''fill the gaps'' for chronic toxicity of NPE oligomers (oligomers are the 1–2 mole ethoxylate of NP, also known as ''short-chain'' NPEs) to aquatic organisms.

    b.     (Request #2) of mixtures to ''fill the gaps'' regarding the additive toxicity of NP and NPE oligomers to aquatic organisms.

    c.     (Request #3) on the estrogenic disruption impact, including multi-generational and population level impact, of NP and NPEs to aquatic organisms.

    d.     (Request #4) of NP and NPEs for vitellogenin gene expression.

  e. (Request #5) to ascertain certain aspects of NP and NPE toxicity to humans, including general population exposure, metabolism, dermal absorption, and placental development, and

  f. (Request #6) industrial laundry workers exposed to NPEs, including epidemiological testing.

24. EPA accepted the first request. Instead of proceeding with a proposed rulemaking, EPA stated that it will publish an Advanced Notice of Proposed Rulemaking (ANPRM). Comments on the ANPRM would guide EPA in developing a proposed testing program under Section 4 of TSCA, 15 U.S.C. § 2603.

25. Regarding Request #2 for testing on amphipods, the Petition explains that water quality standards that recognize the additive impact of chemicals is appropriate when EPA has results on at least three species of ecologically diverse taxa that considers the effect of the subject chemicals considered. EPA only has completed studies for two species that considered the additive effects of NP and various types of NPEs. Therefore, Plaintiffs requested "that EPA require research on a third species from a different taxa, e.g., *hyalella azteca* (an amphipod), to serve as the basis for additive NP and NPE water quality standards." Petition p. 9.

26. EPA denied Request #2 stating that Petitioners were insisting on testing "unspecified mixtures." EPA Response at p. 50957. While the Petition also requested testing on mixtures, EPA failed to address the specific request for a rulemaking to consider the need for testing of the

COMPLAINT DECLARATORY AND INJUNCTIVE RELIEF Page 9

additive effects of individual NPEs on a third species in the same manner as previously done for two other species.

27. Regarding Request #3 for testing regarding specific impacts on the endocrine system of aquatic species, the Petition states that studies had shown NP and NPEs had a substantial impact on specific biochemical processes in aquatic species at extremely low concentrations and that these processes can result in male fish producing female egg proteins. Petition at p. 9. In setting standards for NP and NPEs, EPA did not deny the validity of these studies but did not use them to set standards because they did not demonstrate macro-level effects on reproduction, survival and growth of the aquatic species. EPA Water Quality Criteria at p. 6.

28. The Petition requested that EPA require additional testing "to better understand tangible changes in biochemistry of aquatic species observed in many published studies and the effects of those changes on the reproductive and growth endpoints that EPA uses to establish water quality criteria." Plaintiffs specifically sought multigenerational studies. Petition at p. 10.

29. EPA acknowledged that some studies showed impact of NP and NPEs on the reproductive systems of fish at concentrations below EPA's chronic water quality standard but suggested that the existing studies of chronic toxicity are adequate to gauge long term ecological effects. EPA also said multi-generational test methods were not available and that it was "not yet certain that such methods would provide data that would significantly advance understanding beyond existing chronic study data." EPA stated that it "cannot conclude that the available information relevant to this requested testing is insufficient to permit a reasoned evaluation of the

COMPLAINT DECLARATORY AND INJUNCTIVE RELIEF                                                                 Page 10

1 health or environmental effects of these chemicals or that the requested testing is necessary, and
2 EPA, therefore, denies this request." EPA Response at p. 50957. Nonetheless, EPA also stated
3 that further testing may be required when testing methods have improved.

30.  Existing studies showing reproductive effects on fish at concentrations below the current EPA water quality criteria raise issues that must be resolved in light of NP and NPEs extensive use in commerce and massive dispersion of NP and NPEs in the waters of the United States. EPA has failed to explain how these issues can be resolved with the studies that have heretofore been conducted.

31.  Regarding Request #4, Plaintiffs asked that EPA require that individual NPEs be studied using EPA existing vitellogen gene expression assay. This information would help better understand the contribution of each type of NPE to NPE's overall toxicity. Petition at p. 10.

32.  EPA denied the request on the basis that the "available information on NP and various NPEs is sufficient to adequately demonstrate and evaluate the estrogenic expression of NP and also to provide enough of a basis on which to project the lesser contribution of various NPEs, making further vitellogenin assays unnecessary." EPA Response at p. 50957. However, the vitellogen assays are needed given the fact that there is clearly a need to determine the estrogenetic effects of NP together with NPEs in the environment and the range of ecological effects of these chemicals.

33. Regarding Request #5, Plaintiffs asked for testing to fill gaps in understanding of the impact of NP and NPEs on humans, including dermal absorption, oxidative metabolism, and human placental development. Petition at p. 11.

34. EPA denied the request for studies to fill the gap regarding an oxidative metabolic path in humans by putting forth that "a combination of existing human and animal studies provides a reasonable understanding of the metabolism of NP in humans. The data available indicate a metabolic profile common to phenols (Refs. 12, 13, and 14)." EPA Response at 50957.

35. EPA also denied the request for studies on reproductive effects stating that it "believes it has sufficient information to evaluate NP's reproductive risks to human health without conducting a non-standard placental study of the type requested by petitioners." EPA Response at p. 50958.

36. In addition, EPA denied the request for studies to establish the dermal absorption of NP and NPEs, stating that "studies on dermal absorption have already been conducted and have concluded that dermal absorption of NP is negligible, and that dermal absorption of NPEs through human and animal skin is less than 1% (Ref. 15)."

37. EPA denied the request for studies on NP and NPE exposure to the general U.S. population because the NP was slated for inclusion in a national study. However, EPA failed to acknowledge that the national study showed that between 45 and 57 percent of the U.S. population had measurable levels of NP in its urine. *Id.* See CDC Study.

38.  EPA conclusions regarding metabolism in humans and the need for a national survey run contrary to the recommendations of researchers at its sister agency, the U.S. Centers for Disease Control and Prevention. In a 2005 published study that EPA did not acknowledge in its response, CDC's researchers called for "[a]dditional research to establish the relevance of oxidative metabolism of NP in humans and to identify the urinary metabolites of NP commercial mixtures is warranted. Furthermore, the frequent human exposure to these compounds highlights the need for future studies to measure BPA and NP in a nationally representative sample of the U.S. population." CDC Study at p. 394. EPA's response regarding metabolism and phenols does not address the concern in the CDC study that lack of information regarding an oxidative metabolic pathway may impact exposure assessment for NP and NPE. The response regarding the CDC's national survey does not recognize that the notice cited by EPA states that the listed chemicals only "*may* be included in future releases of the 'Report,'" (emphasis added). See CDC, HHS. Candidate Chemicals for Possible Inclusion in Future Releases of the National Report on Human Exposure to Environmental Chemicals. Federal Register (68 FR 56296, Sept. 30, 2003).

39.  The response regarding the placental study fails to address the differences in results seen in the rat studies cited by the agency versus the more recent trophoblast study cited by Petitioners, and the role that the study requested by Petitioners would play in resolving these differences, as well as establishing the key timeframe of exposure for humans.

40.  The response regarding dermal absorption cites inadequate support for the assertion that multiple studies have been conducted and are conclusive.

COMPLAINT DECLARATORY AND INJUNCTIVE RELIEF                                    Page 13

41. The CDC recommendations need to be implemented and EPA must use its authority under Section 4 of TSCA to require NP and NPE manufacturers and processors to conduct this testing.

42. Regarding Request #6, Plaintiffs asked for an epidemiological study on potential exposure of laundry workers. Plaintiffs cited studies on the general population and studies on workers involved in producing NP and NPEs. But Petitioners could not find any exposure studies of industrial laundry workers. Petition at p. 11 and 12.

43. EPA denied the request for the same reason that Plaintiffs considered it necessary – the lack of exposure information. EPA concluded that there was minimal potential exposure through dermal absorption or volatilization in the 90% of laundries that injected liquid NPEs into the laundry machine. EPA agreed that there may be exposure in the remaining 10% of laundries handling powered detergent but wanted to seek more comment through an ANPR. EPA Response at p. 50958.

44. The EPA response presumes without basis that industrial laundries are aseptic places where the workers are not exposed to the liquids. EPA failed to consider whether use of injected liquid NPEs might result in aerosol formation or ingestion from hand-to-mouth exposure. In addition, research on indoor air in 120 homes in Cape Cod found that 100% of the homes had NP in the indoor air under conditions where volatilization was unlikely. With more than 108,000 laundry workers, an exposure study is necessary.

45.     Information available to the Administrator is insufficient to permit a reasoned evaluation of the health and environmental effects of NP and NPE. In the absence of this information, NP and NPE may present an unreasonable risk to health and the environment. The substance is being produced in substantial quantities and it enters or may reasonably be anticipated to enter the environment in substantial quantities and there is or may be significant or substantial human exposure to it. 15 U.S.C. § 2620(b)(4)(B)(i).

## COUNT II - SECTION 6 REQUESTS

46.     Plaintiffs re-allege paragraphs 1 through 45 from above.

47.     The Petition requested that EPA undertake rulemaking under Section 6 of TSCA to consider four different types of rules. Rules were proposed for consideration during rulemaking that would:

    a.     Require labeling on all products containing NP and NPEs.

    b.     Restrict the use of NPEs where the user cannot verify that the chemicals will receive proper wastewater treatment.

    c.     Ban the use of NP and NPEs in industrial and consumer detergents.

    d.     Require pollution prevention planning by facilities that use 2,000 kilograms or more of NP or NPEs. EPA Response at p. 50956.

48. Plaintiffs offered scientific studies and data collected by EPA and others in the Petition that showed:

   a. Studies of the discharge of sewerage treatment plants and paper mills show that discharges of NP occur, particularly in the wintertime when conventional wastewater treatment is less effective, that exceed the EPA chronic water quality criterion for NP.

   b. Even wastewater treatment plants that employ the best treatment that is commonly required frequently discharge NP and NPEs at levels that EPA researchers have found to be toxic if the additive toxicity of NP and common forms of NPEs is taken into account.

   c. That numerous studies have endocrine disruptive effects at levels of NP and NPEs well below the level that EPA has established as the criterion for chronic toxicity.

   d. That numerous studies have found fish with reproductive systems that have been severely affected by endocrine disruption immediately downstream of discharges from sewerage treatment plants.

   e. That high volumes of NP and NPEs are released into to the nation's waters via by-passes, combined sewer overflows, septic systems, or surface run-off without any wastewater treatment and, accordingly, cannot conceivably be addressed through improvements to wastewater treatment.

49. The Petition further showed, through studies prepared for the Canadian government which has been the use of NP and NPEs, that less toxic alternatives exist and are practically

COMPLAINT DECLARATORY AND INJUNCTIVE RELIEF                                              Page 16

available as substitutes for the use of NP and NPEs as industrial and consumer detergents and that these less toxic alternatives are already in use by some manufacturers.

50. While not denying any of the data presented by the Petitioner as alleged in paragraphs 46 and 47 above, EPA declined to undertake any rulemaking or consider taking any action under TSCA Section 6. EPA concluded that Plaintiffs did "not provide a reasonable basis to conclude that NP and NPEs pose an unreasonable risk to the environment" (EPA response at 50598) without discussing any of the studies, including studies sponsored by EPA, that show that NP and NPEs are having a severe effect on the environment.

51. EPA in its response further stated that the Petition failed to show the effects of the rules proposed in the Petition on the national economy, small business, and technological innovation. EPA ignored evidence offered in the Petition that such effects would be negligible because there are proven alternatives for NP and NPEs. Moreover, EPA erred as a matter of law in rejecting a Petition for rulemaking on the basis that the Petition did not include conclusive proof of all of the facts that EPA considers to be necessary to establish a final rule.

52. EPA in its response also stated that the Petition did not address the extent to which other statutes or voluntary programs could address the risks presented by NP and NPEs. EPA discussed its Safer Detergents Stewardship Initiative ("SDSI") program "to complement the water quality criteria for NP by promoting the voluntary conversion by the detergent industry to alternative surfactants that break down quickly to less toxic compounds," implicitly conceding that there are safe alternatives for many uses of NP and NPEs.

COMPLAINT DECLARATORY AND INJUNCTIVE RELIEF                                   Page 17

53. In fact, the Petition shows that there are no other statutes with which the risks created by NP and NPEs can be addressed satisfactorily. As explained in the Petition, much NP and NPEs enters the environment through discharges that cannot practicably be treated to remove NP and NPEs or through sources that are not even regulated by any current laws.

54. The possibility that voluntary programs will address a risk is not a proper legal basis to reject a petition seeking rulemaking under TSCA. However, even if such voluntary programs are relevant in a proper case, the possibility that voluntary programs might address some of the risks to the environment associated with NP and NPE could not serve as a basis for rejecting the Petition here. The viability of EPA's voluntary program is unknown and the need for mandatory restrictions is demonstrated by the fact that over 400 millions pounds of NPE products are currently produced in the United States despite the existing research showing serious effects on the environment from these chemicals and the restrictions on the use of NP and NPEs in Europe and Canada. Further, some manufacturers and their representatives who commented on the record made clear that they did not intend to stop producing or using NP and NPE anytime in the immediate future.

55. In fact, there is a reasonable basis to conclude that the issuance of such a rule or order is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment. 15 U.S.C. § 2620(b)(4)(B)(ii).

56. NPs and NPEs present an unreasonable risk and Plaintiffs' requested actions are reasonable, cost-effective actions. Two major cleaner producers have eliminated the chemicals from their products. The world's largest retailer is committed to eliminating use of NP and NPEs and safer substitutes for NP and NPEs exist and have been found to exist by the Canadian government.

## PRAYER FOR RELIEF

57. Defendant's denial of Plaintiff's petition entitles Plaintiffs to relief pursuant to 15 U.S.C. § 2620.

58. Wherefore, Plaintiffs pray that the Court grant Plaintiffs the following relief.

   a. Provide Plantiffs an opportunity to have their Petition considered by the Court in a de novo proceeding pursuant to 15 U.S.C. § 2620(b)(4)(B).

   b. Declare that Plaintiffs have demonstrated to the satisfaction of the court by a preponderance of the evidence that there is a reasonable basis to conclude that the issuance of a rule or order consistent with Plaintiff's petition is necessary to protect health or the environment against an unreasonable risk of injury to health or the environment pursuant to 15 U.S.C. § 2620(b)(4)(B)(i) and (ii).

   c. Order EPA to initiate rulemaking as requested in Plaintiff's petition.

   d. Award Plaintiffs their costs of suit and reasonable fees for attorneys and expert witnesses pursuant to 15 U.S.C. § 2620(a)(4)(C).

   e. Grant such other relief as the Court deems just and proper.

Dated: October 23, 2007					Respectfully submitted,

_____
James R. Wheaton ( CA Bar 115230)
Lynne R. Saxton (CA Bar 226210)
Environmental Law Foundation
1736 Franklin Street, 9th Floor
Oakland, CA 94612
(510) 208-4555
Fax: (510) 208-4562
wheaton@envirolaw.org
lsaxton@envirolaw.org


Albert Ettinger
Environmental Law and Policy Center
35 E. Wacker Suite 1300
Chicago, Illinois 60601
Phone: (312) 795-3707
AEttinger@ELPC.org
*Pro Hac Vice* for Plaintiff


Thomas Neltner
1701 Tilton Dr.
Silver Spring, MD 20902
(317) 442-3973
Fax: (866) 234-8505
neltner@ikecoalition.org
*Pro Hac Vice* for Plaintiff